IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

---

SOUTHWEST COMMUNITY
RESOURCES, INC., a New Mexico
corporation, SOUTHWEST
ORGANIZING PROJECT, a project of      No. CIV 98-1544 PK/DJS
SOUTHWEST COMMUNITY
RESOURCES, INC., and JEANNE
GAUNA, in her individual capacity
and as Co-Director of SOUTHWEST
ORGANIZING PROJECT,

     Plaintiffs,

vs.

SIMON PROPERTY GROUP, LP,
owner of COTTONWOOD MALL,
and d/b/a COTTONWOOD MALL;
HEITMAN PROPERTIES OF NEW
MEXICO, LLC, owner of
CORONADO CENTER, and d/b/a
CORONADO CENTER;
PRUDENTIAL INSURANCE
COMPANY OF AMERICA, owner of
WINROCK CENTER, and d/b/a
WINROCK CENTER; and the CITY
OF ALBUQUERQUE,

     Defendants.

---

MEMORANDUM OPINION AND ORDER

---

THIS MATTER comes on for consideration of Defendant Simon Property

Group, LP's Motion for Summary Judgment filed March 6, 2000 (doc. 90), the

Motion of Defendant The Prudential Insurance Company of America for

Summary Judgment Dismissing the Action filed March 6, 2000 (doc. 94),

Defendant City of Albuquerque's Motion for Summary Judgment filed March 6,

2000 (doc. 98), Defendant Heitman Properties of New Mexico LLC's Motion for

Summary Judgment on Plaintiffs' Complaint filed March 7, 2000 (doc. 102), and

Plaintiffs' Motion for Summary Judgment filed March 7, 2000 (doc. 107), and the

court, being advised fully in the premises, finds that the Defendants' motions for

summary judgment should be granted.


<u>Background</u>

Plaintiff Southwest Community Resources, Inc. ("SWCRI") is a not-for-

profit organization engaged in advocacy.  Plaintiff Southwest Organizing Project

("SWOP") is a project of SWCRI with the stated objective "to educate the public

regarding the need for racial and gender equality and social and economic justice

in New Mexico."  Complaint filed December 21, 1998 at 2, ¶ 4 (doc. 1).  Plaintiff

Jeanne Gauna is co-director of SWOP.  Plaintiffs seek a declaratory judgment

that they are entitled under the First Amendment to engage in expressive

activities in the common areas, sidewalks and parking lots of Defendants'

shopping malls, subject to reasonable time, place, and manner restrictions.  <u>See</u>

Pretrial Order filed January 6, 2000 at 3 (doc. 83) (hereinafter Pretrial Order).

They seek an injunction preventing Defendants from interfering with their "peaceful and protected expressive activities in the common areas, sidewalks, and parking lots of the malls."  Complaint at 14.  They also seek attorney's fees and costs.  See Pretrial Order at 3.

All of the Defendants seek dismissal of the complaint, with prejudice, and their costs, and three of the four have expressly requested attorney's fees in defending this action.  See id. at 5; Defendant City of Albuquerque's Answer to Complaint filed February 9, 1999 at 7 (doc. 14).  Defendant Simon Property Group, LP, has counterclaimed for a declaratory judgment that, inter alia, Cottonwood Mall is its private property and that any federal court order requiring Cottonwood Mall to allow Plaintiffs to leaflet and engage in similar activities violates the First and Fourteenth Amendments, as well as the Fifth and Fourteenth Amendments (as a deprivation of property without due process of law and a taking for public use without just compensation).  See Answer, Affirmative Defenses, and Counterclaim of Simon Property Group, LP filed July 6, 1999 at 10-11 (doc. 36).  Defendant Simon also seeks a declaratory judgment that the proposed activities of the Plaintiffs constitute trespass under New Mexico law and it seeks an injunction prohibiting the Plaintiffs from engaging in those activities on its private property in violation of its trespass policy.  See id.

Defendants' shopping malls are commercial enterprises.  Defendants have retained control over various common areas of the malls.  Ironically, it appears

- 3 -

that Plaintiffs seek rights in the common areas broader than those rights which the commercial and governmental tenants have by virtue of their leases. Plaintiffs concede that mall owners who keep their malls private are not subject to the First Amendment, see Hudgens v. NLRB, 424 U.S. 507 (1976); Lloyd Corp. v. Tanner, 407 U.S. 551 (1972).   According to the Plaintiffs, "[i]f the malls did not have government installations located on their property, Plaintiffs would not have a federal constitutional right to distribute literature in the common areas."  See Pretrial Order at 5-6.  However, Plaintiffs contend that the Defendant mall-owners, by leasing space to government agencies, inviting government agencies to make presentations in the malls' common areas, and maintaining public bus stops on mall property, can no longer claim the right to prevent Plaintiffs from engaging in expressive activities on mall property.  In addition to seeking relief against the Defendant mall-owners, Plaintiffs have joined Defendant City of Albuquerque ("City"), contending that it has a policy of actively assisting Defendant mall-owners in enforcing unconstitutional restrictions on expressive activities.  See Complaint at 2, ¶ 2.

At the suggestion of the parties, this litigation has been divided into two phases.  The first phase is to determine whether the First Amendment applies within the confines of Defendants' malls.  If the first phase is decided in Plaintiffs' favor, the second phase would determine what expressive activities are permissible, and what sort of time, place, and manner restrictions are reasonable.

The issue in this first phase concerns "whether the [mall-owner] defendants are engaged in state action or have dedicated their properties to public use." Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Summary Judgment filed March 7, 2000 at 3 (doc. 108) (hereinafter "Plaintiffs' Memorandum"); see also Order filed October 20, 1999 at 2 (doc. 61).

The decision in this first phase hinges on the legal effect of generally uncontested core facts, therefore, this phase is appropriate for resolution by summary judgment. The parties seem to agree. Regardless, no reasonable interpretation of the Plaintiffs' evidence could result in the conclusion that the Defendant mall-owners either engaged in state action or dedicated their properties to public use. Accordingly, summary judgment is warranted in favor of all Defendants and against the Plaintiffs.

Although the Plaintiffs' theory on state action and dedication to public use is the same concerning each of the Defendant mall-owners, the generally uncontested facts relating to each mall are somewhat different. Therefore, at times, the court will distinguish among the malls. Defendant Heitman Properties of New Mexico, LLC, owns Coronado Center ("Coronado"); Defendant Simon Property Group, LP, owns Cottonwood Mall ("Cottonwood"); and Defendant Prudential Insurance Company of America owns Winrock Center ("Winrock"). For ease of reference, Defendants mall-owners sometimes will be referred to by the names of their respective malls.

Coronado, Cottonwood and Winrock are for-profit, commercial enterprises owned by non-public entities.  The vast majority of operations and leased space involves private commercial entities, but each mall leases a small percentage (less than one percent) of its space to certain governmental entities that deal with the public.  These include (1) New Mexico Taxation and Revenue Department, Motor Vehicle Division--service centers that handle routine licensing and registration activities (Cottonwood and Winrock), (2) Albuquerque Police Department (APD)--police substations (Cottonwood and Coronado), (3) Albuquerque SunTran--bus stops, parking spaces for Park-and-Ride programs, and availability of bus passes and schedules (all three malls), (4) United States Postal Service--an unmanned, drive-up postal faciltity (Winrock).  In the past, Coronado and Winrock have leased space for voting matters.

Defendant mall-owners have allowed (with prior permission and approval) use of their common areas for displays and presentations by various private, governmental and non-governmental organizations.  Specifically, Coronado has allowed expressive activities on its premises based upon its business judgment that such activities would serve its commercial purpose and be in the best interests of Coronado and its tenants.  See Pretrial Order at 12 (stipulation).  Winrock has allowed such activities, subject to its application process and guidelines for free-speech activities.  See id. at 14 (same).  Such applications are decided based upon the perceived best business interests of Winrock and

compliance with its guidelines.  See id.  Finally, Cottonwood has permitted such activities, subject to its guidelines, and based upon its business judgment that such activities will promote the business of Cottonwood Mall.  See Response of Defendant Simon Property Group, LP, In Opposition to Plaintiffs' January 21, 2000, Motion for Summary Judgment, filed March 7, 2000 at 5, ¶¶ 16 & 17 (doc. 110).

Defendant mall-owners sometimes deny permission to use their facilities. In June 1998, representatives from Plaintiff SWOP attempted to distribute "brown dollars," intended to show the buying power of Hispanics, within Coronado. They also sought to pass out packets to mall merchants.  These packets contained a letter and leaflets contending, *inter alia*, that the mall's policy limiting the size of groups without adult supervision discriminates against youth, and particularly youth of color.  The materials also took the position that the justification for the policy, to control gangs and youth crime, was pretextual and that the mall was a public, not a private place.  Mall security prevented these representatives from entering the mall to pass these items out, and APD officers were also present.

In October 1998, Plaintiff SWOP requested permission to distribute leaflets at Winrock.  Winrock provided an application and its guidelines for free speech activities, and indicated that it would be willing to consider the request if information concerning the leaflets were submitted for Winrock's prior review

- 7 -

and approval.  Winrock informed SWOP that any decision would be based upon the contents of the application and its judgment as to its business interests.

During the Fall of 1998, Plaintiffs' members also sought permission to distribute leaflets outside the police substation at Cottonwood, but were denied. In December of 1999, Planned Parenthood was not allowed to participate in a "Wonderful World of Women" exposition held at Cottonwood because the group was deemed by mall management to be "potentially controversial."

It is important to focus on what this lawsuit is about.  Despite the Plaintiffs' suggestions that certain mall policies concerning attire and the number of youth that may walk together in the mall are racially discriminatory, the complaint and pretrial order make it clear that Plaintiffs are challenging the malls' ban on speech-related activities, specifically advocacy and distribution of literature in the common areas of the mall.  Thus, the underlying claims of discrimination by public facilities is not the issue in this lawsuit, although such claims may be cognizable under the civil rights laws.  See, e.g., 42 U.S.C. §§ 1981, 2000a; N.M. Stat. Ann. § 28-1-7(F) & (I) (Michie 1996 Repl. Pamp.). In fact, such a case is pending in the United States District Court for the District of New Mexico.  See Rodriguez v. Heitman Properties, No. CIV 98-1545 JC/LFG (D.N.M., Third Amended Complaint filed Dec 21, 1999).

Discussion

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmovant may not rest upon its pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The summary judgment material relied upon by the nonmovant is viewed in the light most favorable to it; however, that material must contain significantly probative evidence that would allow a trier of fact to find in the nonmovant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). A key function of summary judgment procedure "is to isolate and dispose of factually unsupported claims or defenses." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). Factual disputes about immaterial matters (of which there are many in this case) will not preclude summary judgment. See Anderson, 477 U.S. at 248.

In Lloyd Corp. v. Tanner, 407 U.S. 551, 567 (1972), the Supreme Court noted that "the First and Fourteenth Amendments safeguard the rights of free speech and assembly by limitations on *state* action, not on action by the owner of private property used nondiscriminitorily for private purposes only." Plaintiffs argue that Defendants' malls are no longer properly considered purely "private" because of the various interactions with governmental entities. For this reason, the argument continues, the Court's decisions in Lloyd and Hudgens v. NLRB,

- 9 -

424 U.S. 507 (1976), are not dispositive, and the malls must operate within the confines of the First Amendment. For this to be the case, the Plaintiffs must demonstrate that the malls are either engaged in "state action" or have "dedicated their property to public use." <u>See</u> Pretrial Order at 27-28; Order filed October 20, 1999 at 29 (doc. 61). Plaintiffs cannot demonstrate either.

1) <u>State Action</u>

In order for deprivation of any right to be "fairly attributable" to the state, two conditions must be met. The deprivation of the right "must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible." <u>Lugar v. Edmondson Oil Co., Inc.</u>, 457 U.S. 922, 937 (1982). Further, "the party charged with the deprivation must be a person who may fairly be said to be a state actor." <u>Id.</u> "This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." <u>Id.</u>

Plaintiffs cannot satisfy <u>Lugar</u>'s first requirement. In <u>Weinrauch v. Park City</u>, 751 F.2d 357, 360 (10th Cir. 1984), the court held that Plaintiffs must prove that their "alleged deprivation [is] attributable to or result[s] from a government decision." <u>See also</u> <u>Gilmore v. Salt Lake City Community Action Program</u>, 710 F.2d 632, 638 n.13 (10th Cir. 1983) ("<u>Lugar</u> requires not only a characterization

of the party as a state actor, but also a finding that the alleged deprivation is related to a governmental objective.").

Here, the alleged deprivation concerns expression in the common areas, sidewalks and parking lots of Defendants' shopping malls, subject to reasonable time, place, and manner restrictions.  Under Lugar, the Plaintiffs must demonstrate not only a relationship between the government and the malls, but also that any prevention of expressive activities by the malls is somehow related to a governmental objective.  Plaintiffs' evidence falls short of making this showing.  No evidence remotely suggests that the governmental entities participate in control of the malls.  The policies and practices of the malls concerning expressive activity were developed and are applied solely by the private Defendants, even if governmental actors are sometimes called to enforce criminal trespass laws at the malls.

Just as Plaintiffs fail to meet their burden in proving the first prong of Lugar, they are also unable to prove that the Defendant mall owners are state actors.  Whether a private party is a state actor depends upon the application of four different tests, as laid out in Gallagher v. "Neil Young Freedom Concert", 49 F.3d 1442, 1447 (10th Cir. 1995).  The court will refer to these as: (1) nexus test; (2) symbiotic relationship test; (3) joint activity test, and (4) traditional powers test.  The tests apply as follows.

a.  Nexus

- 11 -

The standard for this test is "'whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.'"  Gallagher, 49 F.3d at 1447 (quoting Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351 (1974)).  "[A] state normally can be held responsible for a private decision 'only when it has exercised coercive power or has provided such significant encouragement . . . that the choice must in law be deemed to be that of the State.'"  Id. at 1448 (quoting Blum v. Yaretsky, 457 U.S. 991, 1004 (1982)).  The fact that a private entity contracts with or rents to the government or receives money or other assistance from the government does not automatically transform the entity into a state actor.  See Rendell-Baker v. Kohn, 457 U.S. 830, 840-42 (1982).  Similarly, "the mere presence of police officers does not transform the conduct of private parties into state action."  Gallagher, 49 F.3d  at 1450.

According to the Plaintiffs, a sufficient nexus is shown by "exercise of control by mall management over ingress and egress to government facilities, by the joint press conferences [between the mall and APD], by the public transportation agreements on private property and by the pervasive presence of government agencies and personnel within the mall."  Plaintiffs' Memorandum at 27.  In case of Coronado and Cottonwood, it is also shown by "the working relationship between APD and mall management and security in the enforcement of mall regulations and in the patrolling of the malls."  Id.  Plaintiffs also claim

- 12 -

support based upon the Defendants' allowance of displays and presentations by various government agencies.

The challenged action by Plaintiffs is the prohibition of expression in the common areas, sidewalks and parking lots.  Therefore, the Plaintiffs must show that the State "exercised coercive power" or provided "significant encouragement" with respect to denying or limiting expression, rather than merely demonstrating a close connection between the malls and government in general.  Gallagher, 49 F.3d at 1448.  Most of the facts Plaintiffs rely on to show state action, such as the joint press conferences or the "pervasive" presence of government agencies in the malls are too remote from the conduct actually challenged to meet the nexus requirement.  Additionally, Plaintiffs have not demonstrated that state actors had any input into the malls' access policies, rules of conduct, or decisions to prevent the expressive activities in question.  Merely because a governmental entity may approve of or acquiesce in the activities of a private party does not add up to state action.  See Gallagher, 49 F.3d at 1448.

The only allegation by Plaintiffs that could possibly demonstrate any sort of "coercive power" on the part of the State with respect to limiting expression is "the working relationship between APD and mall management and security in the enforcement of mall regulations and in the patrolling of the malls."  Plaintiffs' Memorandum at 27.  None of the other allegations even apply to the challenged

action.  However, Plaintiffs have not demonstrated this type of "working relationship" between the malls and police.

The Plaintiffs' primary contentions about the relationship between mall management and APD concern Coronado and Cottonwood, since Winrock Mall does not contain a police substation, and does not even arguably have APD officers patrolling the mall.  With respect to Coronado and Cottonwood, the presence of the substations in the malls unquestionably leads to a larger police presence in the malls.  However, the Plaintiffs fail to show that this larger presence is the result of coordination between mall management and APD.  The summary judgment evidence establishes that APD mall substation personnel interact with the public on a wide variety of matters, many of which do not involve the malls.  The fact that APD officers are called upon to investigate crimes that occur on mall property (such as shoplifting, burglary, assault, or criminal trespass) or that APD officers may be present on mall property in an effort to reduce crime through presence simply does not create an inference that the APD acts in coordination with the malls.

Plaintiffs claim that "Coronado's security force patrols the mall with APD officers who assist in enforcing mall rules."  Plaintiffs' Memorandum at 3. Plaintiffs make a similar claim with respect to APD activities at Cottonwood. See id. at 18.  Yet, even taken in the light most favorable to the Plaintiffs, the material cited in support is wanting.  For instance, to support the claim that

- 14 -

"[m]embers of the City's police force routinely patrol Coronado and Cottonwood Malls," Plaintiffs cite to the deposition of Lt. Steve Nix, the commander of the APD substation at Cottonwood Mall.  Id. (citing Plaintiffs' Ex. 12 at 15-16).  Lt. Nix's comments about what happened at the Cottonwood substation prior to his tenure do not appear to be based upon personal knowledge.  But, be that as it may, Lt. Nix responded that the APD gang unit does not work out of the Cottonwood substation.  He then indicated that when Cottonwood opened, for about a week, "we put gang officers out on a holiday type of thing to just basically do random patrolling in the mall area."  Plaintiffs' Motion for Summary Judgment, Ex. 12 at 16 (doc. 107).  This was a one-time event.[1]  There is absolutely no indication that any such patrol was directed by mall management.  Moreover, Lt. Nix further testified that the duties of the APD officers are separate and distinct from those of mall security.  He quite firmly testified that APD officers and security guards do not patrol together and have no agreements regarding patrols--"[t]hey do their thing, we do our thing."  Memorandum in Support of Defendant Simon Property Group, LP's Motion for Summary Judgment filed March 6, 2000, Ex. 2 at 23 (doc. 91).

---

[1]Thus, the materials concerning one individual's 1996 encounter are not particularly probative as they mainly concern this time period.  See Plaintiffs' Memorandum in Opposition to Prudential Insurance Company of America's Motion for Summary Judgment, Exs. 8 & 10 (doc. 96).  The individual was asked to leave the mall by mall security, he left, and then was approached, questioned, and released by the APD gang unit while in his vehicle.

The evidentiary support for the claim that "Albuquerque police officers 'walk the mall' with members of Coronado's security force and help them enforce Coronado's rules," Plaintiffs' Memorandum at 6 (citing Plaintiffs' Ex. 5 at 45-50), is similarly unavailing.  James Hoover, a member of Coronado's private security force, testified that APD officers would "sometimes" walk around with members of the private security force; he also testified that there was not "any particular reason" that the officers would walk around, and that the circumstances under which officers would walk through the mall were "[i]f they are walking to a shoplifting call, going to lunch, going around getting a drink or something, or stretching his legs just walking around, walking outside doing parking tickets, and so forth."  Plaintiffs' Motion for Summary Judgment, Ex. 5 at 45, 46 (doc. 107).  This is a far cry from demonstrating the presence of a regular APD patrol acting at the direction of the malls.  Given the fact that a substation is located in the mall, it would be impossible for an APD officer to attend to his duties without ever walking through the mall.

Likewise, merely because Coronado participates in the Chief's Over-Time Program, a program where a business can hire an off-duty police officer to provide security services and/or traffic control, does not mean that those officers, when on duty, are enforcing the mall's rules.  Although Plaintiffs dispute whether those officers are enforcing Coronado's rules and regulations, as opposed to state law and municipal ordinances, the evidence relied upon by Plaintiffs does not

create a genuine issue.  Mr. Hoover's testimony is merely that the officers'
presence was "to help patrol the mall to let another uniformed presence be known
throughout the mall."  Id. at 47 (cited in Plaintiff's Memorandum in Opposition
to Defendant Heitman's Motion for Summary Judgment, Including Response to
Heitman's "Statement of Undisputed Facts" filed March 7, 2000, at 16, ¶ 27 (doc.
104)).  Mere presence of the officers does not equate to enforcement of the mall's
rules and regulations.

Likewise, merely because the malls were desirous of obtaining APD
substations and would lease space to them for nominal amounts does not tend to
show that the police substations function to enforce mall rules and regulations.  A
police presence in the mall can serve as a deterrent to crime, increase access to
police service by the citizens, and enable APD to better provide services.

Mr. Hoover testified that if an APD officer was walking with him, and Mr.
Hoover asked a group to split up because the group size was in violation of the
mall rules, the APD officer would say nothing; if the members of the group
resisted, the APD officer would ask them to pay attention to the private security
officer and obey.  See id. at 48.  Mr. Hoover detailed the circumstances under
which a private security guard would contact an APD officer.  See Plaintiffs'
Memorandum in Opposition to Prudential Insurance Company of America's
Motion for Summary Judgment, Ex. 15 at 23-25 (doc. 96).  If a patron was
breaking a mall rule and refused to leave for the day after being so requested, and

became insulting to the guard, the guard would call his supervisor.  If the patron still refused to leave, the guard would call an APD officer.  The APD officer would talk to the patron to get his version of events and tell him that he needed to leave.  Id. at 23.

Lt. Nix testified that private security guards handle all violations of mall rules and "essentially unless someone is breaking the law, we don't get involved with it."  Plaintiff's Motion for Summary Judgment, Ex. 12 at 15 (doc. 107). Consistent with this, Kevin Ayers, former Director of Security at Coronado, testified that the private security guards alone enforced the mall's rules, while APD would only intervene if a law had been broken.  See Heitman's Memorandum in Response to Plaintiffs' Motion for Summary Judgment filed March 7, 2000, Ex. 13 at 20-23 (doc. 109).  Similarly, Fritz Martin, Director of Security at Coronado at the time these motions were filed, testified that the decision of whether to eject patrons from the mall rested solely with private security guards, without any input from APD, and that APD would be called only "[b]ecause a crime has been committed."  Id. Ex. 14 at 49-50.

Just as the Plaintiffs fail to adduce evidence of an ongoing relationship between Defendants' malls and APD insofar as enforcement of mall rules and regulations is concerned, their individual examples of alleged APD enforcement of the same also fail to establish the claimed nexus.  For instance, Plaintiffs claim that "APD officers sometimes make the decision that Coronado Mall should

[issue a criminal trespass ("CT") notice] and request that the process be conducted."  Plaintiff's Response to City of Albuquerque's Motion for Summary Judgment filed March 6, 2000 at 4 (doc. 100).  A CT Notice informs a person that he is no longer an invitee of Coronado and that he will be prosecuted for criminal trespass upon return.[2]  See Plaintiffs' Memorandum in Opposition to Prudential Insurance Company of America's Motion for Summary Judgment, Ex. 19 (doc. 96).  One example is a sealed incident report from a private security guard, see id., Ex. 23, in which the guard reports that APD had detained four individuals who had stolen a large amount of items from several stores.  The APD officer requested the security guard to issue a CT notice revoking permission to enter the mall, because APD did not have the authority to do so.  Another example involves similar facts where the offenses reported by APD were shoplifting and disorderly conduct.  See id., Ex. 22; see also id. Ex. 4 (private security guards decided to CT persons that did not heed "no solicitation" warning

---

[2]The municipal ordinance provides:

Criminal trespass consists of unlawfully entering or remaining upon the lands or property of another knowing that any consent to enter or remain has been denied or withdrawn by the person or persons lawfully in possession of the premises or after the request or demand to leave the premises by the authorized representative of the person or persons lawfully in possession of the premises.

Albuquerque, N.M., Crim. Code of Albuquerque, ch. 12, art. 2, § 3 (1974).  See also N.M. Stat. Ann. §§ 30-14-1(B), 30-14-1.1 (A) (Michie 1994 Repl. Pamp. & 1999 Supp.).

and that became involved in a dispute with a customer; APD then called).  Not only is this a perfectly acceptable means of crime prevention, but, most importantly, any cooperation between APD and the private security force in these matters has no bearing on the action Plaintiffs are actually challenging--the malls' prevention of expressive activity, i.e., shoplifting can hardly be considered an expressive activity.

Plaintiffs also claim that "Coronado Security arrested [one individual] at the telephonic direction of an APD officer at the Coronado substation." Plaintiff's Memorandum in Opposition to Defendant Heitman's Motion for Summary Judgment, Including Response to Heitman's "Statement of Undisputed Facts" filed March 7, 2000 at 15 (doc. 104) (citing Plaintiffs' Memorandum in Opposition to Prudential Insurance Company of America's Motion for Summary Judgment, Ex. 12 (doc. 96)).  The cited "incident report" is authored by a private security guard and provides no support for the Plaintiffs' version–the report indicates that a juvenile and another person attempted to reenter the mall after being told to leave, became uncooperative, and then the private security guard decided to issue CT notices.  The private security guard called for APD, APD requested that the matter be handled at the substation, and then the private security guard advised the individuals that they would be placed in handcuffs for the safety of all concerned.  The report simply does not state, even inferentially, that APD instructed the private security guard to make an arrest.

- 20 -

Plaintiffs make much of the fact that APD officers sign the CT notices and the CT notices are sometimes issued at the Coronado police substation.  See Plaintiffs' Memorandum in Opposition to Prudential Insurance Company of America's Motion for Summary Judgment, Exs. 4, 12 & 19 (doc. 96).  APD has its own forms for this; sometimes APD will use a form supplied by the malls. See Plaintiffs' Motion for Summary Judgment, Ex. 7 at 36 (doc. 107).  None of this evidence suggests that APD is making decisions about the underlying enforcement of the malls' rules and regulations concerning expressive activity. Defendant City of Albuquerque correctly explains that in this context "APD is not empowered to question a private property owner's motives when he withdraws permission to someone to be on his property and asks APD for the statutory assistance to which he is entitled."  Defendant City of Albuquerque's Reply to Plaintiffs' Response to City's Motion for Summary Judgment filed March 6, 2000 at 3 (doc. 101).  Moreover, police involvement in support of legitimate private property rights does not convert a private property owner's actions into state action.  See Cape Cod Nursing Home Council v. Rambling Rose Rest Home, 667 F.2d 238, 243 (1st Cir. 1981).  While the summary judgment evidence makes it clear that APD substation personnel attend to matters beyond the territorial boundaries of the malls, APD is empowered to enforce state law and municipal ordinances, even though the violations occur on Defendants' private property.

- 21 -

Plaintiffs specify only two incidents in which the APD even arguably participated with mall security in enforcing rules with respect to expressive activity.  The first is the time SWOP members attempted to distribute leaflets inside Coronado Mall and were prevented from doing so by Coronado's private security force with APD present in the background.  <u>See</u> Plaintiff's Memorandum at 10; <u>see also</u> Plaintiffs' Motion for Summary Judgment, Ex. 10 at 114-119 (doc. 107).  Plaintiff Gauna testified that several SWOP members were demonstrating on the sidewalk in front of Coronado Mall and went to a door of the mall with the intention of entering to distribute letters to merchants.  The group was prevented from entering by private security guards and perhaps by APD, who was present.  Though Ms. Gauna states that she was prevented from entry by "the security guards and the cops," Plaintiffs have also submitted the more detailed affidavit of Roberto Roibal, a community organizer with Plaintiff SWOP, who states that APD stood ten feet behind mall security, that mall security contacted mall management and that five minutes later a woman identifying herself as mall management turned SWOP away.  Plaintiffs' Memorandum in Opposition to Prudential Insurance Company of America's Motion for Summary Judgment, Ex. 6 at 3, ¶¶ 9-10 (doc. 96).

Even assuming that APD's presence deterred entry, that presence was proper given the circumstances.  The attempt to distribute printed material was part of a larger street demonstration, and APD certainly could be present to

- 22 -

maintain order and to prevent criminal trespass onto Coronado. APD is not required to wait for a violation of the law before acting. If APD did, in fact, assist in preventing entry into the mall, the officers were not enforcing Coronado's rules against leafleting, but rather enforcing the municipal ordinance against trespassing.

This same logic disposes of Plaintiffs' other claim concerning APD's enforcement of rules against the distribution of literature, this time at Cottonwood Mall. Plaintiffs' Memorandum at 13 (citing Plaintiffs' Ex. 15 at 9-13; 24-27). The cited deposition testimony establishes that Plaintiff SWOP member Robby Rodriguez and two other members sought to distribute literature inside the APD substation at Cottonwood or, alternatively, in the area just outside the substation. They were told by an APD officer that a municipal ordinance prohibited distribution inside the substation, but if mall management granted permission, the group could distribute the literature outside the substation. Mall management denied this permission. When asked what would happen if the group passed out literature in front of the substation against the wishes of mall management, the officer indicated that the group would be arrested if mall security requested them to stop the distribution and they refused. Once again, this is not a matter of APD enforcing the mall's rules concerning speech; rather it is an instance of indicating that APD will, if necessary, enforce a municipal ordinance against trespassing.

b.  <u>Symbiotic Relationship</u>

This test is met only if the State "'has so far insinuated itself into a position of interdependence' with a private party that 'it must be recognized as a joint participant in the challenged activity.'"  <u>Gallagher</u> 49 F.3d at 1451 (quoting <u>Burton v. Wilmington Parking Auth.</u>, 365 U.S. 715, 725 (1961)).  In <u>Burton</u>, the state leased space to a private restaurant that refused to serve an African-American customer.  The Court found that "profits earned by discrimination not only contribute[d] to, but also [were] indispensable elements in, the financial success of a governmental agency."  <u>Burton</u>, 365 U.S. at 724.  "Post-<u>Burton</u> decisions have emphasized the <u>Burton</u> Court's finding that the restaurant was an indispensable part of a state project and that the state profited from the restaurant's discrimination."  <u>Gallagher</u>, 49 F.3d at 1451.  State action was also found in <u>Milo v. Cushing Mun. Hosp.</u>, 861 F.2d 1194 (10th Cir. 1988), where a private corporation was helping to run a public hospital.  In that case, a very strong degree of interdependence existed, since private corporation members sat on a public board of directors and the city depended on the private management corporation's operations to enable it to repay its bonds and mortgage.  <u>Id.</u> at 1196.  The court in <u>Gallagher</u> seemed to define the question in <u>Burton</u> as:  did the alleged unconstitutional action generate profits that were indispensable elements in the government entity's financial success?  <u>See</u> <u>Gallagher</u>, 49 F.3d at 1453. The Plaintiffs have neither shown that the malls' prohibition of expressive

activities (the alleged unconstitutional action) was financially beneficial to the state, nor that any relationship between the malls and the state is an "indispensable element" in the state's financial success. Thus, they cannot meet this test of state action.

The Plaintiffs argue that the "interdependence" test is met because mall security and APD work together at Cottonwood and Coronado Malls to provide security, the malls and the City of Albuquerque work together to provide public transportation within mall property, and the mall regulates access to government facilities. See Plaintiffs' Memorandum at 27. Perhaps Plaintiffs' strongest argument is that the malls gain customers by stationing government facilities in the malls and in return offer the government reduced rent such that both entities benefit economically. Id.

However, even if government benefits from its leasee relationship with the malls through reduced rent, it receives no benefit whatsoever from the prohibition of Plaintiffs' expressive activities, the action complained of. Additionally, the Plaintiffs have not shown that any of these contracts are "indispensable elements in [any government entity's] financial success." See Gallagher, 49 F.3d at 1453; Vincent v. Trend W. Technical Corp., 828 F.2d 563, 569 (9th Cir. 1987) (no symbiotic relationship if relationship not "indispensable element" of [state's] financial success). Almost any bilateral contract will contain terms that benefit both sides, and call for mutual obligations, creating some sort of dependence

- 25 -

between the parties.  In an effort to better serve the citizenry, a few governmental entities have located in or on the mall; this contributes to one of the purposes of the mall–a convenient one-stop location to transact business.  This is not the type of "interdependence" contemplated by the symbiotic relationship test.

     c.  <u>Joint Action</u>

     Under the joint action test, state action is present if a private party is a "'willful participant in joint action with the State or its agents.'" <u>Gallagher</u>, 49 F.3d at 1453 (quoting <u>Dennis v. Sparks</u>, 449 U.S. 24, 27 (1980)).  Unlike the symbiotic relationship test of <u>Burton</u>, which looked at the long-term interdependence between the state and a private entity, this test focuses on "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." <u>Id.</u>  In arguing that joint action is present between the City and the Defendant malls, Plaintiffs make the same general contentions as described above, citing government displays and presentations in the common areas of the malls, joint security and transportation agreements, and joint use of police facilities.  <u>See</u> Plaintiffs' Memorandum at 27. Just as with the nexus test, the state and private entities must act jointly to perpetrate the alleged constitutional violation, not just act jointly in general.  <u>See</u> <u>Gallagher</u>, 49 F.3d at 1453.  Thus, Plaintiffs' contentions about subjects of joint actions other than actions stopping expressive activities  are outside the scope of this test.

In the Tenth Circuit, joint action between the police and private parties is sufficient to meet this test only when the police have "substantially assisted" in the wrongful conduct.  See id. at 1455; Carey v. Continental Airlines, Inc., 823 F.2d 1402, 1404 (10th Cir. 1987); Lee v. Town of Estes Park, 820 F.2d 1112, 1114-15 (10th Cir. 1987).  Acquiescence of state officials in the actions of a private party is not sufficient to show a joint enterprise.  See Gallagher, 49 F.3d at 1453.  To meet this test, there must be, at a minimum, specific concerted action resulting in the violation of a plaintiff's constitutional rights.  Id.  As discussed extensively in the section on the nexus test, Plaintiffs have failed to produce evidence suggesting that the police join in the enforcement of the malls' rules and regulations that restrict expressive activities.  The summary judgment evidence establishes that APD officers act no differently when responding to a call from mall security than to any other call, and participate in enforcing the law against criminal trespass as they would for any other private actor.  See Heitman's Memorandum in Response to Plaintiffs' Motion for Summary Judgment filed March 7, 2000, Ex. 16 at 55, 89 (doc. 109).  The fact that APD officers may use a form provided by the malls (or one of their own) in issuing a CT notice is of no moment.

d. Traditional Powers

When the State delegates to a private party a function "traditionally exclusively reserved to the State" then that private party is necessarily a state

- 27 -

actor.  Jackson v. Metropolitan Edison Co., 419 U.S. 345, 352 (1974).  However, "[t]his test is difficult to satisfy.  While many functions have been traditionally performed by governments, very few have been exclusively reserved to the State."  Gallagher, 49 F.3d at 1456 (citations and internal quotations omitted).  The Plaintiffs contend that the exclusive state function that has been delegated in this case is the control over access to governmental facilities.  Because the government has established such facilities as Motor Vehicle Division offices, police substations, and public bus stops within mall property, and because mall management controls access to these facilities by setting mall hours (which apply to the governmental facilities as well) and through the malls' rules of conduct, Plaintiffs argue that the government has ceded its traditionally exclusive right to control access to its own facilities.  This argument fails as well, because controlling access to public facilities leased by the government is simply not a function that has been "traditionally *exclusively* reserved to the state."

The only case cited by Plaintiffs as analogous to this one is Beattie v. Boeing Co., 43 F.3d 559 (10th Cir. 1994).  Beattie involved an employee of Boeing who was denied a security clearance.  The Air Force had, by contract, delegated limited authority to Boeing to grant or deny access to a secured area in which two Air Force planes were being built by Boeing.  The Beattie court found, in the context of a Bivens action, that there was no reason to treat the decision by Boeing to deny a security clearance any differently than if it had been made

directly by the Air Force.  <u>Beattie</u>, 43 F.3d at 566.  Plaintiffs contend that, under the logic of <u>Beattie</u>, because the government in this case contractually ceded control over access to its facilities to mall management, mall managements' decisions should be treated as if they had been made directly by the government. However, <u>Beattie</u> is distinguishable in several significant respects.

First, the decision in <u>Beattie</u> was made in the context of a <u>Bivens</u> action. The court determined <u>in this specific context</u> that Boeing's decision involved national security matters and therefore was entitled to the same deference (precluding review) as if it had been made by the Air Force.  This is not the same as saying that any time a governmental entity contractually grants power to a private entity to control access to a government facility the private entity's decision will be treated as a state action.  Second, the criteria to be used by Boeing in making its access determinations were specified by the Air Force.  <u>See Beattie v. Boeing Co.</u>, No. 91-1050-K, 1992 WL 223742, at *2 (D. Kan. Aug. 10, 1992).  In this case, all decisions concerning the access policy were made by mall management, without any input from governmental entities.  Third, the decision-making power delegated in <u>Beattie</u> involved access to a tightly-controlled secured military area.  This type of clearance decision is much more likely to be considered a traditionally exclusive government function than access decisions concerning public governmental facilities such as the MVD.  Finally, it is not clear to this court that the government agencies are, in fact, delegating authority

to mall management.  In renting space in the mall, the government agencies have simply agreed to abide by the same rules as all other tenants of the malls.  The malls control their common areas pursuant to the inherent rights of any private property owner.  Agreeing to abide by the malls' existing rules is not the same as expressly delegating duties to mall management. The access policy was not "'caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.'"  Gallagher, 49 F.3d at 1447 (quoting Lugar, 457 U.S. at 937).

Even if the court believed the governmental agencies were delegating control over access to certain leased facilities, the court is also unpersuaded by Plaintiffs' contention that the exercise of such control is traditionally exclusively a state function.  A concert promoter and its agents that leased a government facility for a concert were deemed not to be state actors in Gallagher.  Hiring a private security force to control entry to the facility was not enough, especially where the security force was acting pursuant to its own policies, without any input from the government.  See Gallagher, 49 F.3d at 1456.  Similarly, in Reinhart v. City of Brookings, 84 F.3d 1071 (8th Cir. 1996), no state action was found when the city allowed a private arts festival committee to establish rules for a festival in a public park.  The city gave the private committee full responsibility for planning the festival and deciding who could occupy booths at the festival.  The committee denied booths to all political candidates and

prohibited distribution of literature by anyone without a booth.  A candidate for office brought a §1983 action, claiming that the city was liable for the private festival committee's actions and policies, which were alleged to be in violation of the First and Fourteenth Amendments.  The court found that "[t]he fact that [the City] permitted the committee to adopt rules and enforce them does not convert the private action of the committee into state action," Reinhart, 84 F.3d at 1073, and held that because the festival committee's policy and actions "may not fairly be said to be those of the City . . . the city may not be held liable under § 1983." Id. at 1074.

The court finds unpersuasive Plaintiffs' argument that the state delegated control of access to its facilities in violation of New Mexico law requiring that the public be given free access to any facility owned or operated by any branch of government.  See Plaintiffs' Reply to Defendant Heitman's Response to Plaintiffs' Motion for Summary Judgment filed March 7, 2000 at 6 (doc. 113) (citing N.M. Stat. Ann. § 30-20-13(A) (Michie1994 Repl. Pamp.)).  Of course, the statute qualifies the right by requiring that the access be "lawful."  Second, the statute allows limits to access not consistent with the lawful mission of an agency.  See N.M. Stat. Ann. § 30-20-13(C); Livingston v. Ewing, 652 P.2d 235, 239 (N.M. 1982).  There simply is no constitutional right to be allowed to engage in a full range of expressive activities, including leafletting, in every facility controlled by government.  See Perry Educ. Ass'n v. Perry Local Educators'

Ass'n, 460 U.S. 37, 53 (1983).  Indeed, Plaintiffs concede that they do not have a right to hand out literature inside government offices.  See Plaintiffs' Reply to Defendant Heitman's Response to Plaintiffs' Motion for Summary Judgment filed March 7, 2000 at 10 (doc. 113).  Third, what Plaintiffs claim as an exclusive governmental function, the right to control access to leased governmental facilities, is not the proximate cause of any limitation on Plaintiff's expressive activities.  Plaintiffs have made no allegations in this case that anyone who sought to conduct business at a government facility was ever prevented from doing so.  The complaint concerns those who sought access to the malls in order to engage in certain expressive activities and were prevented from entering for that purpose.  The evidence is undisputed that when SWOP members later sought permission to enter Coronado to patronize its businesses, they were allowed to do so.  See Heitman's Memorandum in Support of its Motion for Summary Judgment filed March 7, 2000, Ex. 11 at 2 (doc. 103).

The court also rejects the related contention that because a now-closed office of the Motor Vehicles Division was used as a site to gather nominating petition signatures, see Plaintiff's Motion for Summary Judgment, Ex. 17 (doc. 107), the malls are required to allow such a practice because the Division may be a tenant.  Such a complaint would have to be taken up with the State, who entered the lease, not the Defendant mall-owners, who merely seek, consistent with their agreements, to control their common areas.

- 32 -

2.    <u>Has the mall been dedicated to public use?</u>

Because Plaintiffs have failed to demonstrate that Defendants are engaged in state action, they can prevail only if they can show that the private malls have been dedicated to public use.  Plaintiffs are also unable to make this showing.  At the outset, Plaintiffs acknowledge the Supreme Court's decision in <u>Lloyd Corp. v. Tanner</u>, 407 U.S. 551 (1972), in which the Court held that private property does not "lose its private character merely because the public is generally invited to use it for designated purposes."  <u>Id.</u> at 569.  However, Plaintiffs attempt to distinguish this case from <u>Lloyd</u> by arguing that <u>Lloyd</u> applies only to "private property used nondiscriminatorily for private purposes only." <u>Id.</u> at 567. Plaintiffs contend that the malls in this case have lost their private nature because "their owners, for business reasons, have devoted retail space within their malls and their common areas to frequent and pervasive governmental use . . . ." Plaintiffs' Memorandum at 30.  According to the argument, because the decision in <u>Lloyd</u> was based on the private nature of the mall, any mall that can be characterized as no longer private must therefore be subject to the First

Amendment.[3]  They suggest that the <u>Lloyd</u> Court contemplated a different result

in such a case when it wrote:

> We do say that the Fifth and Fourteenth Amendment rights of
> private property owners, as well as the First Amendment rights of all
> citizens, must be respected and protected.  The Framers of the
> Constitution certainly did not think these fundamental rights of a free
> society are incompatible with each other.  There may be situations
> where accommodations between them, and the drawing of lines to
> assure due protection of both, are not easy.  But on the facts presented
> in this case, the answer is clear.

407 U.S. at 570.  Neither this language, nor any other cited by Plaintiffs,

demonstrates that the addition of a government tenant or bus stop is sufficient to

take these malls out of the realm of <u>Lloyd</u>, thereby transforming the private

character of their property into public.

Plaintiffs attempt to demonstrate the public nature of the malls by asserting

that the malls have "'assumed to some significant degree the functional attributes

of public property devoted to public use.'"  Plaintiffs' Reply To Defendant

Heitman's Response to Plaintiffs' Motion for Summary Judgment filed March 7,

_____

[3]Plaintiffs state that the <u>Lloyd</u> Court found that the mall in question had
been kept "purely private."  Plaintiffs' Memorandum at 29.  Plaintiffs repeatedly
employ the phrase "purely private," both with and without quotation marks,
throughout their briefs.  <u>See</u> <u>e.g.</u>, <u>id.</u> at 2, 29, 30, 31; Plaintiffs' Reply to
Defendant Heitman's Response to Plaintiffs' Motion for Summary Judgment filed
March 7, 2000 at 3 (doc. 113); Plaintiffs' Reply to Defendant Simon's Response
to Plaintiffs' Motion for Summary Judgment filed March 7, 2000 at 2, 8, 9 (doc.
112). The court notes that neither the <u>Lloyd</u> case, nor any other Supreme Court
case to address this issue ever used the word "purely" to modify "private."  The
use of such a modifier, especially in quotation marks, to suggest a stronger, more
absolute position than the Court actually took, is inaccurate.

2000 at 2 (doc. 113) (quoting Central Hardware v. NLRB, 407 U.S. 539, 547 (1972)).  They argue that government entities, such as those found in the malls, are open to the public in a way that is broader than the way in which a private shopping mall is open to the public, and that "[b]ecause the malls provide access to government facilities and activities, the Plaintiffs have a right to be in the malls.  A citizen who is lawfully on a public way carries with him 'the constitutional right to express his views in an orderly fashion'" Id. at 3 (quoting Members of the City Council v. Taxpayers for Vincent, 466 U.S. 789, 810 (1984)).  Plaintiffs repeatedly make the argument that, because the malls contain certain governmental entities which are open to the public, the malls do not have the authority to restrict who may enter the malls.  This is a false issue.  Plaintiffs are not challenging the malls' rules of conduct with respect to who may enter the mall, nor have any Plaintiffs alleged that they were ever prevented from entering the mall in order to conduct business with a governmental entity.  The mere fact that the malls have leased space to governmental entities and allowed occasional presentations by governmental organizations does not equate to having dedicated private property to public use.

Though the Supreme Court has occasionally mentioned the concept of "private property dedicated to public use," it has never defined its contours. When, in Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 801 (1985), the Court stated "as an initial matter a speaker must seek access to

public property or to private property dedicated to public use to evoke First Amendment concerns," it gave no examples of such private property.  Nor was the property at issue in <u>Cornelius</u> private, making the mention of the concept dicta.  This dicta likely flowed from the language of <u>Lloyd</u>, where the concept of private property dedicated to public use was first mentioned by the Court.  However, in <u>Lloyd</u>, the Court seemed to disfavor the concept, calling it an "attenuated doctrine" that was "by no means" constitutionally required and refusing to apply it to the property at issue.  407 U.S. at 569.  <u>See also</u>, <u>Hudgens v. NLRB</u>, 424 U.S. 507, 519 (1976) (quoting with approval the "attenuated doctrine" language of <u>Lloyd</u>).  Thus, the vitality and applicability of the doctrine are open questions.

What is clear, however, is that property, whether public or private, cannot become a designated public forum without the specific intent of the government (in the case of public property) or the owner (in the case of private property).  In the case of public property that is not a "traditional public forum," unless the government specifically chooses to create a designated public forum, the property will be classified as either a nonpublic forum, or not a forum at all.  <u>See Arkansas Educ. Television Comm'n v. Forbes</u>, 523 U.S. 666, 678 (1998).  The intention requirement is borne out through a long line of forum classification cases.  <u>See e.g.</u>, <u>Int'l Soc'y for Krishna Consciousness, Inc. v. Lee</u>, 505 U.S. 672, 680 (1992) ("[T]he government does not create a public forum by inaction.  Nor

- 36 -

is a public forum created 'whenever members of the public are permitted freely to

visit a place owned or operated by the Government.'" (citation omitted));

Cornelius, 473 U.S. at 802 (public forum only created by government

"intentionally opening a nontraditional forum for public discourse . . . [T]he

Court has looked to the policy and practice of the government to ascertain

whether it intended to designate a place not traditionally open to assembly and

debate as a public forum.").

Plaintiffs argue that because defendants deliberately leased space to

governmental entities and allowed presentations by government agencies, they

knowingly changed the character of their private malls into a public forum

because citizens patronizing these entities and presentations must retain the same

First Amendment rights they would have if the entities and presentations had

been located on public property.  Taking an overly broad view of N.M. Stat. Ann.

§ 30-20-13(A), the New Mexico statute making it a petty misdemeanor to deny

the public lawful access to government facilities, Plaintiffs suggest that

Defendant malls should have known that they could not lease space to

government facilities and still maintain control of access.

Plaintiffs' argument ultimately fails because the nature of the malls'

invitation to the public is only to do business with the malls' tenants (including

the government facilities), not to engage in any expressive activities.  Such an

invitation would be insufficient to create a designated public forum if issued by

- 37 -

the government.  See Hawkins v. City and County of Denver, 170 F.3d 1281

(10th Cir. 1999).  In Hawkins, the City and County of Denver owned its own

performing arts complex.  The only access to the theaters in the complex was by

a wide walkway that had formerly been a public street, and was still public

property.  The plaintiffs in that case wanted to picket and distribute leaflets

within the walkway, and the subject matter was relevant to the activities being

held inside the venue.  However, the court ruled that the common area walkway

was not a designated public forum because "Denver has neither in policy nor

practice thrown open the [walkway] for public expressive activity."  Id. at 1288.

This ruling was made despite the fact that the walkway was the exclusive means

of ingress and egress to public facilities and despite the fact that Denver allows

some speech in the area.  The complex had a policy clearly stating that

demonstrations and leafleting were not permitted within the complex without the

express consent of management.  The court found that this policy, similar to the

ones in place at Defendants' malls, demonstrated Denver's intention not to create

a designated public forum.  Id.  The Hawkins decision follows a long line of

Supreme Court precedent, such as Cornelius, where the Court said "[w]e will not

find that a public forum has been created in the face of clear evidence of a

contrary intent . . . nor will we infer that the government intended to create a

public forum when the nature of the property is inconsistent with expressive

activity." <u>Cornelius</u>, 473 U.S. at 803.  To determine intent, a court is to examine the property's nature and its policies and practices.  <u>Id.</u> at 802.

Plaintiffs offer no evidence that the requirements for creation of a public forum by a private property owner are any less stringent than those applied when the government owns the property in question.  In fact, the definition of "dedication" in Black's Law Dictionary suggests that, if anything, the requirements for finding dedication of private property to public use are even more stringent.  <u>See</u> Black's Law Dictionary 412 (6th ed. 1990) (defining "dedication" as "A deliberate appropriation of land by its owner for any general and public uses, *reserving to himself no other rights than such as are compatible with the full exercise and enjoyment of the public uses to which the property has been devoted*.") (emphasis added)).  Thus, the court will follow the standards used to evaluate a claim that government property has been designated for public use.

Following these standards, it is clear the Defendant malls have not dedicated their malls to public use.  The malls' nature as primarily a collection of retail establishments is inconsistent with a desire to create a forum for public discussion.  The only invitation issued to the public is to come to the malls to do business with their tenants.  The fact that a few of these tenants may be government facilities does not change the nature of the invitation.  <u>See</u> <u>Lloyd</u>, 407 U.S. at 565 (quoting with approval Justice White's dissent in <u>Amalgamated</u>

- 39 -

Food Employees Union Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 338 (1968) in which he carefully detailed the limited nature of the invitation issued by a private shopping mall.)

Plaintiffs repeatedly refer to presentations and events sponsored by government agencies that are allowed to take place in the malls' common areas. Those activities and events allowed by mall management are tightly controlled and designed solely to attract shoppers to the mall and to generate goodwill. They do not demonstrate an intention to create a general public forum. See id. at 564-65 (finding that the activities and exhibits at the Lloyd Center were for the benefit of the mall, and did not constitute an "open-ended invitation to the public to use the Center for any and all purposes, however incompatible with the interests of both the stores and the shoppers whom they serve"). Indeed, a great deal of "clear evidence of a contrary intent" exists, as demonstrated by each malls' formulation, posting, and enforcement of various rules and regulations pertaining to expressive conduct, including speech. Defendant mall owners have clearly reserved a number of rights to themselves that are incompatible with the creation of a public forum, and have not made the dedication claimed by Plaintiffs.

Having determined that Defendant mall-owners have neither engaged in state action nor dedicated their private property to public use, the court also carefully considered various additional arguments and authority relied upon by

- 40 -

Plaintiffs.  Plaintiffs rely upon <u>Jamison v. Texas</u>, 318 U.S. 413, 416 (1943), and

<u>Lee v. International Soc'y for Krishna Consciousness, Inc.</u>, 505 U.S. 830 (1992),

for the proposition that a citizen has a First Amendment right to express himself,

through handbills and literature and advocacy, wherever he is lawfully entitled to

be.  <u>See</u> Plaintiff's Memorandum in Opposition to Prudential Insurance Company

of America's Motion for Summary Judgment filed March 6, 2000 at 13 (doc. 96).

Such reliance is misplaced.  <u>Jamison</u> involved distribution of handbills on a

public street owned by the government, a traditional public forum.  <u>Lee</u> involved

in-person solicitation of funds and distribution of leaflets in three government-

owned and operated airports.  The Court held that airports are not traditional

public fora and upheld a complete ban on in-person solicitation, but concluded

that leafleting was permissible, subject to time, place and manner restrictions.

Here, the common areas of the malls are neither owned nor operated by the

government, nor are they under government control.

　　　Plaintiffs also contend that they have an implied easement to cross the

malls' common areas to get to the space leased by government tenants.  <u>See</u>

Plaintiffs' Reply to Prudential's Response to Plaintiffs' Motion for Summary

Judgment at 8 (doc. 114); Plaintiffs' Memorandum in Opposition to Prudential

Insurance Company of America's Motion for Summary Judgment at 27 (doc. 96)

(citing <u>Wal-Go Assoc's v. Leon</u>, 624 P.2d 507, 510-11 (N.M. 1981);  <u>Owsley v.

Hamner</u>, 227 P.2d 263, 268 (Cal. 1951)).  However, the issue of an implied

- 41 -

easement adds nothing to the Plaintiffs' argument; it merely once again demonstrates the dichotomy between the right of access to do business with a government agency and the right to engage in expressive activities. The right of access to do business with a government agency in the malls is simply not at issue in this case.

Plaintiffs further argue that in controlling the supposed easement across the common areas to the government facilities, the malls' management is performing a state action. See Plaintiffs' Memorandum in Opposition to Prudential Insurance Company of America's Motion for Summary Judgment at 18 (doc. 96) (citing Citizens to End Animal Suffering and Exploitation, Inc. v. Faneuil Hall Marketplace, Inc., 745 F.Supp. 65, 72 (D. Mass. 1990)). Plaintiffs' reliance on Faneuil Hall is unavailing because the nature of the property at issue in that case is completely different from that of the property in this case. In Faneuil Hall, the property was owned by the city, had traditionally been used as a forum for public discourse, was extensively regulated by the city, and was indistinguishable from the immediately-adjacent public areas. Additionally, the city had reserved an easement "for the benefit of and use by the general public, for [access to nearby public streets]. Id. at 69-71. In this case, the property on which the malls sit is privately owned, they are not traditional fora for public discourse, the City does not extensively regulate them, there is no government easement reserved, and there are clear boundaries between the malls' private property and adjacent public

- 42 -

areas.  The <u>Faneuil Hall</u> court found that "[t]he absence of such boundaries has proven to be critical in distinguishing between purely private shopping centers and shopping centers to which the Constitution applies." <u>Id.</u> at 71 n.13 (citing <u>Hudgens</u>).

Finally, the court notes that the two cases cited by Plaintiffs in which courts found that the public had a right to distribute leaflets in private malls are neither applicable nor persuasive.  Both cases were decided based on their respective states' constitutions, both of which provide protection for free speech far exceeding that of the First Amendment.  <u>See</u> <u>New Jersey Coalition Against War in the Middle East v. J.M.B. Realty Corp.</u>, 650 A.2d 757, 760 (N.J. 1994); <u>Bock v. Westminster Mall Co.</u>, 819 P.2d 55, 58-60 (Colo. 1991).

NOW, THEREFORE, IT IS ORDERED, ADJUDGED and DECREED that Defendant Simon Property Group LP's Motion for Summary Judgment filed March 6, 2000 (doc. 90), is granted.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that the Motion of Defendant The Prudential Insurance Company of America for Summary Judgment Dismissing the Action filed March 6, 2000 (doc. 94), is granted.

IT IS FURTHER, ORDERED, ADJUDGED and DECREED that Defendant City of Albuquerque's Motion for Summary Judgment filed March 6, 2000 (doc. 98), is granted.

IT IS FURTHER, ORDERED, ADJUDGED and DECREED that Defendant Heitman Properties of New Mexico LLC's Motion for Summary Judgment on Plaintiffs' Complaint filed March 7, 2000 (doc. 102), is granted.

IT IS FURTHER, ORDERED, ADJUDGED and DECREED that Plaintiffs' Motion for Summary Judgment filed March 7, 2000 (doc. 107), is denied.

DATED this <u>27th</u> day of June 2000, at Santa Fe, New Mexico.

*Paul Kelly Jr.*

United States Circuit Judge
Sitting by Designation

Counsel:

John W. Boyd and Scott M. Davidson, Freedman Boyd Daniels Hollander Goldberg & Cline, P.A., Albuquerque, New Mexico, for Plaintiffs.

Joseph Aviv and Bruce L. Segal, Miro Weiner and Kramer, a professional corporation, Bloomfield Hills, Michigan, and Michael W. Brennan, Madison, Harbour, Mroz & Brennan, P.A., Santa Fe, New Mexico, for Defendant Simon Property Group, LP.

Don H. Reuben, John F. Gibbons and Jane B. McCullough, Altheimer & Gray, Chicago, Illinois, and John R. Cooney and Christopher P. Muirhead, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, New Mexico for Defendant Heitman Properties of New Mexico LLC.

Frank C. Salazar and Norman S. Thayer, Sutin, Thayer & Browne, a Professional Corporation, Albuquerque, New Mexico, for Defendant Prudential Insurance Company of America.

Robert M. White, City Attorney, and Kathryn Levy, Assistant City Attorney, Albuquerque, New Mexico for Defendant City of Albuquerque, New Mexico.